JACOB SALEWSKI, Appellant, v. MINNEAPOLIS, ST. PAUL, & SAULT STE. MARIE RAILWAY COMPANY, a Corporation, Respondent.

(181 N. W. 72.)

**Railroads — frightening horse by ordinary switching operations not actionable.**

1. A railroad company is not liable for injuries resulting from horses becoming frightened at a railroad crossing by the sight of a locomotive engaged in switching; and which locomotive was then moving in the usual and ordinary manner, and was attended only by the noises incident to the usual and ordinary operation of locomotive.

**Railroads — findings held not to show negligence in frightening horse.**

2. For reasons stated in the opinion, it is *held* that the jury, by their answers in the special verdict, found that defendant was free from actionable negligence.

**Appeal and error — error as to failure to instruct and to submit interrogatories as to contributory negligence held immaterial in view of verdict of no negligence.**

3. In an action for personal injuries, errors predicated on failure to give requested instructions and to submit requested interrogatories bearing on the question of contributory negligence become immaterial where the special verdict shows that the jury found the defendant not guilty of negligence.

---

NOTE.—On liability of railroad company operating trains or cars longitudinally along public street for frightening horses by blowing off of steam or causing other noise, see note in 49 L.R.A. (N.S.) 677.

On sufficiency of general allegations of railroad's negligence by frightening horses, see note in 59 L.R.A. 230.

**Appeal and error — discretion of court in denying new trial not disturbed.**

4. For reasons stated in the opinion it is *held* that the trial court did not err in denying a new trial.

Opinion filed December 31, 1920. Rehearing denied January 18, 1921.

Appeal from the District Court of Stutsman County, *Coffey*, J.

Plaintiff appeals from the judgment and from an order denying a new trial.

Affirmed.

*Knauf & Knauf*, for appellant.

In submitting a case on special issues, it is necessary that all the issues should be found by the jury, and the court should by its charge explain the law upon any issue, where it is necessary for a thorough understanding of the question by the jury. Merzbacker v. State, 36 S. W. 308; Baxter v. R. Co. 80 N. W. 644; Schrunk v. St. Joseph, 97 N. W. 947.

The lower court should have given the instructions necessary to inform the jury as to the issues, rules for considering the testimony, the burden of proof, and to make the jury clearly understand its duty. L. N. A. & C. R. Co. v. Frawley, 9 N. E. 594; Mauch v. Hartford, 87 N. W. 816; Burns v. Co. 19 N. W. 380.

The issue should have been submitted directly, tersely, and in some form. It was not. The failure was prejudicial and erroneous. McGowan v. R. Co. 64 N. W. 891; Byington v. City, 88 N. W. 26; Dohman v. Ins. Co. 71 N. W. 69; Andrews v. R. Co. 71 N. W. 372; Kreutzer v. R. Co. 40 N. W. 657; Klatt v. Lbr. Co. 66 N. W. 791.

The negligence of a third person contributing to the injury, which would not have occurred but for the defendant's negligence, cannot be imputed to the plaintiff. Ouverson v. Grafton, 5 N. D. 281, 65 N. W. 676; Chambers v. R. Co. (N. D.) 163 N. W. 824; City v. Botzck, 94 C. C. A. 563, 169 Fed. 121; Union Pacific R. Co. v. Lapsley, 51 Fed. 174, 2 C. C. A. 149, 152, 16 L.R.A. 800; Little v. Hackett, 116 U. S. 366, 29 L. ed. 652.

A special verdict should be limited to the case made by the pleadings, should find all the facts proven under the issues, and should not embody statements of conclusions of law or fact. A finding that one of the parties has been guilty of negligence has often been held by this court

47 N. D.—5.

to be a mere statement of conclusion. Railway Co. v. Adams, 105 Ind. 151, 5 N. E. 187; Railway Co. v. Spencer, 98 Ind. 186; Railway Co. v. Bush, 101 Ind. 582; Connor v. R. Co. 105 Ind. 62, 4 N. E. 411; Railway Co. v. Balch, 105 Ind. 93, 4 N. E. 288; Railway Co. v. Frawley, 110 Ind. 18, 9 N. E. 594.

Judgment reversed with directions to grant a new trial. C. St. L. & P. R. Co. v. Burger, 24 N. E. 981.

*Lee Combs* and *S. E. Ellsworth (John L. Erdall* and *John E. Palmer,* of counsel), for respondent.

"If the party fails to base or make the motion upon the basis authorized in the statute, he is held to have abandoned his motion for a new trial upon the grounds declared." King v. Hanson, 13 N. D. 85, 99 N. W. 1085.

The whole system of new trial seems to be based upon the theory that certain proceedings must be taken by the party applying for such new trial, and that, if these proceedings are omitted, his motion for a new trial fails. White v. Sacramento County, 72 Cal. 475, 14 Pac. 87; Cooney v. Furlong, 66 Cal. 520, 6 Pac. 388.

No error can be predicated upon the ruling of the court in denying the motion for a new trial, for the reason that, since no statement had been settled and allowed, there was nothing before the court to support such motion. Simmons v. Bunnell, 101 Cal. 223, 35 Pac. 770; Sulton v. Simmons, 100 Cal. 576, 35 Pac. 158; Keating v. Kennedy (Cal.) 138 Pac. 118.

In a special verdict it is the duty of the jury to find the facts only while the trial judge determines their legal effect. 38 Cyc. 1774; Morrison v. Lee, 13 N. D. 591, 102 N. W. 223; Swallow v. First State Bank, 35 N. D. 608, 161 N. W. 207; Russell v. Meyer, 7 N. D. 335, 75 N. W. 262; Guild v. More, 32 N. D. 474, 155 N. W. 44; Collins v. Mineral Point & N. Y. R. Co. (Wis.) 117 N. W. 1014; Cooper v. Ins. Co. (Wis.) 71 N. W. 606; Byington v. Merrill (Wis.) 88 N. W. 26.

"The purpose of a special verdict is to obtain separate findings on material, controverted issues, and questions are properly refused which submit to the jury every matter on which witnesses differ in the course of the trial. Ward v. Chicago, M. & St. P. R. Co. (Wis.) 78 N. W. 442.

A railroad company is not liable for injuries resulting from horses becoming frightened on a highway, at the sight of its engines, or the noises necessarily incident to the operation thereof. Walters v. Chicago, M. & St. P. R. Co. (Wis.) 80 N. W. 451; Abbot v. Kalbus (Wis.) 43 N. W. 367; Dotson v. Michigan C. R. Co. (Mich.) 153 N. W. 1066.

A railroad company is not liable for injuries caused by a team taking fright at the ordinary operation of a train upon its road. Railroad Co. v. Roberts (Neb.) 91 N. W. 707; Hendricks v. Fremont, E. & M. V. R. Co. (Neb.) 93 N. W. 141; Dewey v. Chicago, M. & St. P. R. Co. 75 N. W. 75.

The law is well settled that a railway company is not liable for the consequences of such noises on or in the vicinity of public streets, made by its locomotives or trains, as are incident to the operation thereof. Walters v. C. M. & St. P. R. Co. 104 Wis. 251, 80 N. W. 451; Dewey v. C. M. & St. P. R. Co. 99 Wis. 457, 75 N. W. 74; Cahoon v. C. & N. W. R. Co. 85 Wis. 572, 55 N. W. 900; Crowley v. Chicago, St. P. M. & O. R. Co. (Wis.) 99 N. W. 1017.

Where one person is driving with another for the mutual pleasure of both, with opportunity to see and equal ability to appreciate the danger, and is in fact looking out for herself, but makes no effort to avoid the danger, such person is chargeable with the want of care which results in injury. Bush v. Union P. R. Co. (Kan.) 64 Pac. 624; Willfong v. Omaha & St. L. R. Co. (Iowa) 90 N. W. 358.

CHRISTIANSON, Ch. J. In this action, the plaintiff seeks to recover damages for the death of his wife, which he alleges was occasioned by the negligence of the defendant. It is averred in the complaint, and the evidence shows, that the plaintiff's wife, Tina Salewski, on June 27, 1917, was riding in a buggy which was being drawn by a single horse along Fourth avenue, in the village of Courtenay. The horse was being driven by a niece of the deceased. As they were about to cross the railroad tracks of the defendant in that village, the horse became frightened at a locomotive, so that it suddenly turned and threw the plaintiff's wife from the buggy and caused her serious injuries, from which injuries, it is alleged, that she died about two and one-half years later. The specific charge of negligence in the complaint is that the

defendant had permitted sheds, buildings, and coal sheds to be constructed adjacent to and adjoining the railway track on the west side of Fourth avenue, in said village of Courtenay, "so that it was impossible for the said Tina Salewski or the said Hannah Bartkowski to see the north railway track lying immediately to the right and on the westerly side of said Fourth avenue, which said track crosses the said Fourth avenue in an easterly and westerly direction; and that owing to the aforesaid premises and the aforesaid conditions, all of which were negligently permitted, kept, and maintained by the said defendant and its tenants, and by reason of the said railway track being negligently permitted to be built and maintained immediately adjacent to and within 4 feet of said buildings, and as the said Hannah Bartkowski and Tina Salewski were riding along in a buggy drawn by said horse, in a southerly direction toward, and were about to enter upon and cross the said railway tracks aforesaid, and on the northerly side thereof, suddenly and *without warning and with great negligence* and without ringing any bell, and without blowing any whistle, and without giving any sign or signal, and without keeping or maintaining any gate at said crossing, and without keeping any flagman or having any flagman or switchman thereat, the agents of the said defendant company negligently, suddenly, and without warning whatsoever, carelessly and negligently pushed and moved its cars and engine with great speed and without any noise or warning, down upon the said avenue and crossing from a westerly direction, on said sidetrack and house track immediately adjacent to the said buildings, shed, and lumberyard, and suddenly and negligently scared the horse hitched to and drawing the said buggy in which the said Tina Salewski was riding, so that the horse suddenly turned and threw the said Tina Salewski from the said buggy, greatly and permanently injuring her shoulder, arm, back, and abdomen, nerves and spine, and caused her great pain and injuries and suffering, all through the negligence and want of proper and ordinary care on the part of the defendant, in its building and permitting the said buildings, sheds, lumber, and material to be placed and piled so close to its track and the said Fourth avenue, in said village of Courtenay, and its sudden pushing and shoving of said cars and engine belonging to said defendant with great negligence and without warning to the said Tina Salewski or said Hannah Bartkowski, and by reason

of its failure to give some warning sign of the approach of its engine and cars upon said railway track and crossing, and by reason of its failure to properly protect and guard pedestrians and travelers upon said highway, street, and avenue, from injury by its engine and cars." The defendant by its answer placed in issue all the material allegations of the complaint, except the allegations relating to the corporate capacity of and the ownership by the defendant of the railroad in question. The answer also averred affirmatively that the injuries of the deceased, if any, were occasioned by her own negligence and by the negligence of the person who was driving the horse.

At the close of the testimony, a request was made for a special verdict. The court submitted the case accordingly to the jury for a special verdict upon twenty-five questions. No general verdict was returned. The court gave instructions to the jury wherein it defined the terms, "negligence," "approximate cause," and "contributory negligence."

The questions and answers embodied in the special verdict are as follows:

Question 1: Was the Minneapolis, St. Paul, & Sault Ste. Marie Railway Company, a corporation, organized and doing a general railway business of North Dakota in 1917, and was said company on the 27th day of June, 1917, operating a local freight train and doing switching in the village of Courtenay and across Fourth Avenue?

Answer: Yes.

Question 2: On the said 27th day of June, 1917, were Hannah Bartkowski and Tina Salewski riding in a buggy, drawn by a single horse on Fourth avenue, in Courtenay, North Dakota, and approaching the crossing of said railway company on said Fourth avenue?

Answer: Yes.

Question 3: Did said railway company have three separate tracks running through the village of Courtenay, across Fourth avenue, on the 27th day of June, 1917, and was the north track of said railway company known as the house track?

Answer: Yes.

Question 4: On the 27th day of June, 1917, in the village of Courtenay, on Fourth avenue, north of the house track of said railway company, did the horse attached to said buggy become frightened, and did an accident occur?

Answer: Yes.

Question 5: If you answer the above question "Yes" then I will ask you at what distance on Fourth avenue, north of the crossing on the house track, did the horse become frightened and the accident take place?

Answer: Thirty-five feet.

Question 6: Did Tina Salewski sustain injuries by reason of any accident, at or about that time and place?

Answer: Yes.

Question 7: At the time of such accident, if any occurred, was the said railway company's engine and train, approaching Fourth avenue at the crossing of the railroad on the house track?

Answer: Yes.

Question 8: At what rate of speed was said engine and train approaching and coming upon said crossing?

Answer: Six miles an hour.

Question 9: Was the bell being rung or the whistle blown?

Answer: Yes.

Question 10: At the time said engine was approaching the crossing, did one of the train crew, one Louis Larson, appear on the said railway crossing of Fourth avenue, warning Tina Salewski and Hannah Bartkowski to stop in the street north of said crossing?

Answer: No.

Question 11: Did said Louis Larson go north across said tracks, in front of the engine, entering upon Fourth avenue, warning Tina Salewski and Hannah Bartkowski of danger?

Answer: Yes.

Question 12: Did Tina Salewski and Hannah at the time they were driving down Fourth avenue approaching said house track look east and west for approaching trains?

Answer: Yes.

Question 13: What fencing, wood, or brick, if any, were there on the east of the coal shed and the intersection of Fourth avenue and the house track?

Answer: Part of old fence, one pile of brick, one pile of wood.

Question 14: Did Tina Salewski see, or could she by looking have

seen, the engine approach said crossing prior to the time the accident happened?

Answer: No.

Question 15: Did the coal sheds, fencing wood, or brick, if any there were, prevent Tina Salewski and Hannah Bartkowski from seeing the engine approach?

Answer: Yes.

Question 16: Could said Tina Salewski and Hannah Bartkowski, by the exercise of reasonable and ordinary care, have seen or heard the engine approaching, and have stopped their horse and prevented the accident?

Answer: No.

Question 17: Was said railway company negligent at this time and place in handling and operating its railway engine and train?

Answer: Yes.

Question 18: If you answer the foregoing question "Yes," then was such negligence the proximate cause of the injury which said Tina Salewski received?

Answer: Yes.

Question 19: Was Tina Salewski herself negligent in her manner of *driving* towards said railway engine and crossing or by failing to look and listen for the train?

Answer: Yes.

Question 20: If you answer the foregoing question "Yes," then did such negligence contribute to her own injury?

Answer: Yes.

Question 21: Was the injury the result of a pure accident for which no one was to blame?

Answer: Yes.

Question 22: What is the reasonable value of the medical services in taking care of and treating said Tina Salewski?

Answer: Fifteen hundred dollars.

Question 23: Did Tina Salewski die on the 19th day of October, 1919?

Answer: Yes.

Question 24: Was the injury received by her, if any, on the 27th day of June, 1917, the proximate cause of her death?

Answer:  Yes.

Question 25:  What is the value of the household services of Tina Salewski, of which Jacob Salewski has been deprived by reason of her death?

Answer:  Fifty dollars a month.

Upon such special verdict, the trial court entered a judgment in favor of the defendant.  Thereafter, plaintiff moved for a new trial upon the grounds of errors of law occurring at the trial; failure of the evidence to justify the answers to questions 19, 20, and 21; and refusal to submit certain requested interrogatories and to give certain requested instructions.  The trial court made an order denying a new trial, and the plaintiff has appealed from the judgment and from the order denying his new trial.

The respondent contends that the proceedings upon the motion for a new trial were fatally defective; and that in contemplation of law no motion for a new trial was ever made.  It seems that the trial court entertained somewhat similar views, for in his memorandum opinion denying the motion for a new trial he said:  "I therefore deny the motion for a new trial upon the ground that proper steps have not been taken  .  .  .  to bring the errors assigned to the attention of the court in the manner provided by statute, for review."

The trial court did not, however, rest its decision upon this ground alone.  He further said:  "It is clear from the special verdict that the jury deliberately intended to find that the plaintiff was guilty of contributory negligence, in this action, and to defeat the plaintiff's right of recovery, and in this respect I am in full accord with the finding and determination of the jury.  Whatever discretion I have to exercise in this case is exercised against granting a new trial, upon the ground that I believe the plaintiff is not entitled to a recovery in this action, upon the evidence submitted to the jury."

We do not find it necessary to determine whether the trial court was correct or incorrect in its views as to the procedural questions, for we are entirely satisfied that the order denying a new trial should be affirmed on its merits.

There was square conflict in the evidence as to what distance from the railroad track the accident occurred.  The plaintiff's witness Hannah Bartkowski testified that the accident occurred some 8 or 10 feet

from the crossing.   Other witnesses who testified for plaintiff placed the distance at from 15 to 20 feet.   The witnesses who testified for the defendant claimed that the distance was considerably greater.   The jury found (in answer to the 5th interrogatory) that the accident occurred 35 feet from the crossing.

There was also a square conflict in the evidence as to whether the bell on the locomotive was being rung at the time of the accident, and shortly prior thereto.   There were many witnesses who testified on the part of the defendant that it was being rung, and some testified on the part of plaintiff that they did not hear it; and that they would have heard it if it was being rung.   There was absolutely no evidence to the effect that the whistle was blown at any time while switching was being done; and there is positive testimony to the effect that the whistle was not blown at the time of the accident or shortly prior thereto.   In view of the evidence there can be no room for doubt but that the jury, in their answer to the ninth interrogatory, must have found that the bell was being rung as testified to by defendant's witnesses.

The ninth interrogatory really contained two questions:

(a)  Was the bell rung?

(b)  Was the whistle blown?

As a general rule, a question for a special verdict should not be framed in the alternative or disjunctive.   It should be plain, single, and direct.   A violation of this rule may introduce into the verdict an element of uncertainty.   Thus if in this case the defendant had contended that the locomotive gave signal of its approach to the crossing in question, both by blowing the whistle and by ringing the bell, and the plaintiff had contended that neither signal was given, then of course it might have been possible that some of the jurors might have found that the bell was being rung, but that the whistle was not blown, while others might have found that the whistle was blown, but the bell was not being rung.   But that is not the condition here.   In this case there was absolutely no evidence and no contention that the whistle was blown as the locomotive approached the crossing.   Whatever evidence there was on this question was all to the contrary.   If the question had been divided into two parts, the jurors, as reasonable men, could not possibly have said that the whistle was blown.   The great preponderance of the evidence, however, was to the effect that the bell was being

rung; and there can be no room for doubt but that is what the jury found, and intended to find, in their answer to the ninth interrogation.

The evidence adduced on the part of the defendant was to the effect that one of the brakemen on the train, one Louis Larson, was stationed at the crossing while the switching was going on. The evidence adduced by the plaintiff was to the contrary. Larson testified: "I stopped in here somewhere (indicating on a certain map) between the passing track and the house track. To the east of the center of the avenue, I saw a bay horse driving up the road. Driving towards me from the north on Fourth avenue. There were two women in the rig. I stood on the crossing for the purpose of protecting it, while the train was working. That was part of my duty.

Q. What did you do, if anything, while flagging the crossing there, when you saw that train start to move over the crossing east?

A. I held up my hand like this [indicating] for them to stop, because I seen they were getting too close to make the crossing. . . .

Q. What did you do after holding up your hand?

A. I stood there for a minute.

Q. A second or two, you mean?

A. Yes, and the engine came up to the crossing, a little closer, and I saw the horse start to turn, and I ran over ahead of the engine.

Q. You ran over where?

A. To the north side.

It will be noted that the court submitted two questions relating to the warning claimed to have been given by Larson, viz., questions 10 and 11. A number of witnesses testified with reference to whether such warning was given and as to where Larson was at the time it was given. One witness testified that Larson made two attempts to stop the approaching rig. Apparently the court was of the opinion that the evidence required the submission of two separate questions upon this phase of the case. The jury answered the first one in the negative and the second one in the affirmative. It will be noted that the affirmative answer to the 11th interrogatory is in accord with the testimony of the witness Larson. The tenth interrogatory asked the jury if "at the time said engine was approaching the crossing, did . . . one Louis Larson, *appear* on the said railway crossing of Fourth avenue, warning

Tina Salewski and Hannah Bartkowski to stop in the street north of said crossing?" The jury could not well have answered this question in the affirmative if they believed the testimony of Larson; for according to Larson's testimony he did not come forth into view from a distance or from a place or state of concealment (Funk & W. New Standard Dict.) "at the time said engine was approaching the crossing; ' but was then, and had for some time been, stationed at a certain point between the passing track and the house track. Nor according to his testimony did he give any directions to the two women as to where they should stop. He merely gave them the usual signal with his hand, warning them of the approaching train. We see no reason for holding that the answers to the two interrogatories are inconsistent. Intelligent men would not have been likely to have answered the 11th interrogatory in the affirmative, if they had believed that Larson was not in fact stationed at the crossing, and had not in fact given the warning he claimed to have given, and gone over the track ahead of the approaching locomotive as he testified that he did.

Hence, we have this situation established by the findings of the jury. The plaintiff and the deceased came driving from the north towards the railroad crossing. An engine of the defendant, which was ringing a bell, approached the crossing at the rate of 6 miles per hour; a brakeman signaled them by holding up his hand; the horse became frightened at the engine, and started to turn, with the result that the deceased fell out of the buggy and was injured. This occurred 35 feet away from the track. In connection with these findings it is permissive to consider the facts which are uncontroverted. Swallow v. First State Bank, 35 N. D. 608, 616, 161 N. W. 207. There is no dispute as to how the accident occurred. There is no claim that the engine collided with the horse and buggy. The claim is, and the evidence shows, that the horse became frightened at the engine, and started to turn towards the east; that the driver, Hannah Bartkowski, dropped the reins and jumped out; that the buggy was not overturned, but that it was tilted, and the deceased fell out. The driver, Hannah Bartkowski, when called as a witness for the plaintiff, testified: I went up to the Piper-Howe Lumber Company, "and got some trimming for the house, and then I turned around and went back south again; didn't go faster than a slow trot, and there was a man driving in front of me on a lumber wagon, well,

a little ways ahead, and I was driving just the slow trot, looking west as far as I could look and east, and a couple of times looked straight ahead, and I couldn't see or hear anything, and all at once that farmer waved at me in front of me, and I stopped the horse just immediately the train came by, and *the horse got scared and turned towards the east and I jumped out,* and my aunt was thrown out."

There is no contention that the engine made any undue noise, or that there was anything unusual about it or its operation whatsoever.

It is essential that railroads be operated. And "as a general rule the principle is uncontroverted that a railroad company is not liable for the frightening of animals, where such a result ensues from the ordinary use, movement, or situation of its cars, locomotives, or trains. This proposition, of course, implies that it has a lawful right to make all such noises as are necessarily connected with the proper transaction of its business, such as the blowing of a whistle by a locomotive engine, or the emission of steam, where the engine is propelled by it, and such act is a necessary incident to its use. The general rule applies whether the frightening occurs at a railroad crossing or on an adjoining highway, as, generally speaking, the duty of keeping a lookout and of giving warning is limited to the track and public crossing. Necessarily the duty of a railroad company towards the drivers of horses on adjoining highways must be limited in its scope to harmonize it with other duties imposed by the rules of the statutory and the common law. Trains must be run on schedule and at high speed, crossing signals must be given, and it is the duty of an engineer to keep a lookout for crossings. All the perils occasioned to the wayside traveler by noises and sights necessarily produced in running trains in the country on schedule are things that the traveler must guard against, not perils that the operators of trains must watch for and prevent. So, no liability attaches where injury results to a horse from becoming frightened by the giving of the usual signals as required by law, or by the rules of the railroad in the ordinary operation of the train. The law, however, imposes on a railroad company the duty of operating trains relatively to adjacent highways so as not unnecessarily to interfere with the rights of individuals traveling such highways, or to endanger such travelers by unusual and unnecessary noises and if it does anything unusual or

unnecessary which would naturally be calculated to frighten ordinarily well-broken and gentle horses, it may be held liable."

In Dewey v. Chicago, M. & St. P. R. Co. 99 Wis. 455, 75 N. W. 74, 4 Am. Neg. Rep. 92, the supreme court of Wisconsin said: "They [the railroad company's servants] had a right to move the engine in pursuit of defendant's business in which they were engaged, and without responsibility on defendant's part for the consequences of any of the ordinary noises which the operation of the engine caused, or such incidents as the ordinary escape of smoke and steam. If such were not the case, railway companies would be greatly embarrassed in the performance of the duties they owe to the public. There appears to have been an utter failure to show any excessive or unreasonable blowing off of steam, or any unusual noise, or anything not ordinarily attendant upon the usual movements of a locomotive. That where injuries result from the frightening of horses by the sight of moving cars, trains, or locomotives, or the usual noises or incidents of their ordinary operation, there is no liability on the part of the railway company, is firmly established and recognized as the law. Abbot v. Kalbus, 74 Wis. 504, 43 N. W. 367; Cahoon v. Chicago & N. W. R. Co. 85 Wis. 570, 55 N. W. 900; Flaherty v. Harrison, 98 Wis. 559, 74 N. W. 360; Elliott, Railroads, § 1264, and numerous cases cited. See also Walters v. Chicago, M. & St. P. R. Co. 104 Wis. 251, 80 N. W. 451, 6 Am. Neg. Rep. 737; Hendricks v. Fremont, E. & M. Valley R. Co. 67 Neb. 120, 93 N. W. 141; Crowley v. Chicago, St. P. M. & O. R. Co. 122 Wis. 287, 99 N. W. 1017; Chicago, B. & Q. R. Co. v. Roberts, 3 Neb. (Unof.) 425, 91 N. W. 707; Dotson v. Michigan C. R. Co. 187 Mich. 650, 153 N. W. 1065.

Under the facts in this case, as established by the uncontroverted evidence, and the findings of the jury, we are of the opinion that plaintiff is not entitled to recover. In order to warrant a recovery for the plaintiff, he must show, and the special verdict together with the uncontroverted facts, must establish, that the defendant was guilty of negligence, and that such negligence was the proximate cause of the injury for which compensation is sought. This court has ruled that "the failure of a special verdict to find upon any material fact in issue is equivalent to a finding against the party upon whom the burden of proof rests to establish such fact." Boulger v. Northern P. R. Co. 41

N. D. 316, 171 N. W. 632. Here it is not a case of failure to find in favor of the party having the burden of proof, but a case where the specific facts have been found against him. And while it is true the jury, in answer to the 17th interrogatory, said that the defendant was negligent at the time and place in handling and operating its railway engine, the answer to the interrogatories covering the specific facts are to the contrary. "Positive findings as to material facts which are conclusive of the controversy overcome those which are merely incidental." Boulger v. Northern P. R. Co. supra. And we have failed to find any evidence tending to show that there was anything out of the ordinary in the operation and handling of the engine,—certainly there is no evidence that any undue or unusual noises were made. The proximate cause of the injury was the fright of the horse. That fright was not, under the facts as found by the jury, caused by anything unusual or unnecessary done by the defendant in the operation of its engine. Inasmuch as the jury in effect found that the injury was not occasioned by defendant's negligence, the errors assigned by appellant upon the failure of the trial court to give certain instructions and submit certain interrogatories bearing on the question of contributory negligence become immaterial. Deisenrieter v. Krause-Merkel Malting Co. 92 Wis. 164, 66 N. W. 112.

Appellant contends that under the rule laid down in Nygaard v. Northern P. R. Co. 46 N. D. 1, 178 N. W. 961, he was entitled to a new trial. In that case the trial court granted a new trial on the ground that it believed it should have given more explicit instructions on certain phases of the case. In affirming that decision a majority of this court held that the trial court "exercised a discretionary right in granting a new trial, and did not abuse its discretion in so doing." It has been said: "A test of what is within the discretion of a court has been suggested by the question, May the court properly decide the point either way? If not, then there is no discretion to exercise. If there is no latitude for the exercise of the power, it cannot be said that the power is discretionary." Hayne, New Tr. & App. Rev. ed. p. 1650. This principle was recognized in the decision in the Nygaard Case. For in the majority opinion it was said: "If . . . the trial court should have denied the motion for a new trial, the contentions of the appellant might be considered well taken, and the order of

the trial court, in such event, should probably not be disturbed." 178 N. W. 963. In this case the trial judge exercised his discretion against the plaintiff. He was of the opinion that the ends of justice would be best subserved by denying a new trial. On the record before us we see no reason for saying that the trial court was in error in ruling as it did. On the contrary, we are inclined to the view that the ruling was entirely correct.

The judgment and order must be affirmed. It is so ordered.

ROBINSON and BIRDZELL, JJ. concur.

BRONSON, J. I dissent. The majority opinion, with a partial recitation of the facts in the record, demonstrates its own error. It is quite necessary to protest concerning the manner in which this case was submitted to the jury for a special verdict upon interrogatories, and concerning the evident mistrial that has resulted by reason thereof. It is necessary again to protest against the evident recognition given by the majority opinion to the propriety of interrogatories framed and submitted to the jury as they were in this case. The majority opinion has set forth these interrogatories in full. On their face, in connection with the record, they demonstrate that issues of law were submitted to the jury and issues of fact in reality reserved for the court. That, in a manner, the jury became the judge of the law, and the court, of the facts, thereby directly interfering and disturbing the constitutional and statutory functions of both the court and the jury. In this case, the majority opinion states that the trial court exercised its discretion against the plaintiff, and therefore the plaintiff cannot complain. Nevertheless, the trial court denied a new trial upon grounds of procedure, and for the further specific reason that the deceased was guilty of contributory negligence as found by the jury. The majority opinion abandons, apparently, both of these grounds, so asserted by the trial court as reasons for denying a new trial, and bases its holding upon the ground that the jury found that the defendant was not negligent. By such reasoning does it assert that the discretion of the trial court should not be disturbed?

Then, again, the jury, in an answer to the direct question so propounded, found that the defendant was negligent. Perhaps the major-

ity opinion so states, like Antony spoke at the funeral of Julius Cæsar, that "Brutus was an honorable man." No quarrel is to be had with the authorities cited in the majority opinion. The pertinent point is the method of their application. It may not be doubted that, if the defendant, through the failure to exercise reasonable care at the time of this accident, frightened the horse and proximately occasioned the injuries and resultant death of the deceased, it is liable; and, *vice versa,* if the injuries resulted through the fright of the horse upon the sight of the moving locomotive through the usual noises or incidents of its ordinary operation without defendant's negligence, it is not liable. In the case at bar the locomotive of defendant's freight train was engaged in switching at a local town. The freight train was standing on the main track, at or near one of the crossings involved. There were three different tracks crossing the highway involved, in rather close proximity. The locomotive, at the time of the accident, was proceeding on a so-termed house track towards the highway. Its view by the traveler on such highway was excluded by a coal shed, fencing and piles of wood and brick, and by another building. At that time the deceased was riding in a buggy towards this crossing upon the highway. The horse was then being driven by another person. It was 35 feet from the crossing when the accident occurred. At that time it was the duty of the defendant to give a warning of the approach of the locomotive, by blowing the whistle or ringing the bell. This was a statutory duty. Comp. Laws 1913, § 4642. And, regardless of the statute, it was its duty, in any event, to give notice of the approach of the locomotive at all points of known or reasonably apprehended danger. Coulter v. Great Northern R. Co. 5 N. D. 568, 578, 67 N. W. 1056. It was its duty to keep a proper lookout to avoid inflicting injury. Rober v. Northern P. R. Co. 25 N. D. 394, 142 N. W. 22. It was also its duty in this case to flag this crossing. The defendant's brakeman, Louis Larson, testified that it was a part of his duty while the train was working to flag the crossing, and he stood there for the purpose of protecting the crossing. It was also its duty to refrain from creating and continuing the usual noises incident to the ordinary operations of its service, if in the exercise of reasonable care and ordinary prudence, it might thereby avoid fright in a horse and consequent injuries to a traveler upon the highway. 33 Cyc. 936; Carraher v. San Francisco

Bridge Co. 100 Cal. 177, 34 Pac. 828; Williams v. Chicago, B. & Q. R. Co. 78 Neb. 695, 14 L.R.A.(N.S.) 1224, 111 N. W. 596, 113 N. W. 791; Louisville & N. R. Co. v. Penrod, 24 Ky. L. Rep. 50, 66 S. W. 1012.  The driver, a witness for the plaintiff, testified that this brakeman was not there at the crossing when she started down the road to the crossing; other witnesses similarly testified; she never saw the brakeman before that she knew of; that after she and the deceased got hurt some man asked them if they were hurt; she would not recognize the man.  She testified that just previously at the lumber yard (this is about 200 feet distance from the crossing) she got some molding.  She then turned around and went towards the south on a slow trot; there was a farmer driving in front on a lumber wagon; all at once the farmer, ahead, waved.  She stopped the horse.  Immediately, the train went by; the horse got scared and turned; she jumped out, her aunt was thrown out and the horse ran away.  Just previously the farmer, his horses, and wagon, escaped the engine close to him by slapping the lines, the horses jumping, jerking to the side of the track, and going on.  The brakeman, in addition to the testimony stated in the majority opinion, further testified that he was the rear brakeman on the freight train; the train stopped east of this street after he unloaded and loaded freight; he walked around the train to look over hot boxes.  During this time the other brakeman had uncoupled the engine and some cars, and pulled over upon the house track (where this accident occurred).  That he was about five minutes unloading the freight and six to eight minutes walking around the train; that after he got through looking over the train he stopped right on this crossing, between the passing track and the house track; that the engine was then east of this house track.  It was backed up west of the crossing to spot some cars; this was their second trip on the house track.  He remained where he was; that he was watching the engine and looking up the road; that there were some wagons going across the track while he was standing there; he did not see this witness, the farmer, coming along with the wagon; he saw a rig with the two women in it some 200 feet, or such a matter, north of this north track (the house track); that he held up his hand for them to stop because he saw that they were getting too close to make the crossing; that he saw the horse start to

47 N. D.—6.

turn, and he ran over ahead of the engine to the north side, and that he crossed the house track ahead of the engine to see what had happened. That the rig then was some 50 or 60 feet from the center of the north track.

It is rather difficult to discover the harmony that the majority opinion finds in the jury's answers to interrogatories Nos. 10 and 11. It attempts to harmonize such answers because, forsooth, the jury would not have found that Larson went north across the track in front of the engine, warning the two women of danger if they had believed that he was not in fact stationed at the crossing, and had not in fact given the warning he claimed to have given. It arrives at harmony accordingly by the finding as a *fact,* that this engine was ringing the bell as it approached the crossing at the rate of 6 miles per hour; that the brakeman did signal the women by holding up his hand (presumably in time to avoid the accident) ; that the horse then became frightened at the engine and started to turn, with the result that the deceased fell out of the buggy and was injured. The opinion underscores the word "appear" in the 10th interrogatory, and gives to it, by definitive meaning, a status like unto the vision of Banquo's ghost. In question 10, the jury directly and incontrovertibly stated and found that this brakeman, when the engine was approaching the crossing, did not *appear* on such crossing warning the women to stop in the street north of such crossing. In question 11 the jury found that this brakeman did go north across said *tracks* (tracks in the plural) in front of the engine, entering upon Fourth avenue, warning the women of danger. The brakeman did testify that he went north of the tracks as hereinbefore recited, but the question is, *When?* The answer, perhaps, might be, "Not until the women and the horse were in a position of danger and at a time when *acts* of *aid,* not of *warning,* were necessary.

Assuredly, if the interrogatories can be made consistent it may not be upon the theory asserted in the majority opinion. Again, the majority opinion upholds the affirmative answer of the jury to the 9th question, "Was the bell being rung or the whistle blown?" It disapproves of the submission of such question in the alternative or disjunctive, but condones the offense in this case by showing that there was no evidence of the whistle being blown, and, therefore, the answer of the jury must have concerned the bell. Even so, the vice of the

question is not alone therein. It was the duty of the defendant to keep a lookout and give warning of its approach, by the ringing of the bell, if such warning was proper, prior to the approach, as a warning to the occupant, and not, after the approach, as an occasion of fright for the horse.

The pertinent question was, in this regard, and the one necessary to be answered by the jury, "When was the bell being rung?" and, "To what extent prior to the approach upon the crossing?" From such premises, the majority opinion deduces the conclusion that the jury found no negligence on the part of the defendant. The elements of negligence, if any, in this record are failure to exercise reasonable care concerning lookout, warning, and flagging. It is manifest that the jury, by the questions propounded, did not find upon the questions, as issuable facts, whether or not the defendant exercised due care in these respects. The fact that the engine did not make undue noise, or that there was nothing unusual in its incidental and ordinary operation, did not absolve it from care in respect to the matters mentioned. See cases cited, supra. The brakeman, through his own testimony, apparently left his post as flagman after discovering the horse and women in difficulty, without any attempt to flag or stop the engine. But the error in the questions submitted are to be further discussed. The jury found, pursuant to interrogatory 17, that the defendant was negligent, at this time and place, in handling its railway and train. This was a question of law for the court. This question was improperly submitted to the jury. The majority opinion recognizes this by disregarding the answer of the jury in that respect, and by controlling and superseding such answer through the other specific findings made by the jury. In interrogatories 19 and 20 the jury found that the deceased was negligent in her manner of driving toward the engine and crossing, or, by failing to look and listen for the train, and in interrogatory 20, that such negligence contributed to her own injury. Interrogatory 19 is a double question. No one can tell whether the deceased was held guilty of negligence in *her manner of driving* or in her *failing to look and listen* for the train. Furthermore, the evidence is undisputed that the deceased was not driving the horse; and so, the trial court denied the motion for a new trial upon the ground that the deceased was guilty of contributory negligence although, in interroga-

tory 16, the jury found that the women, by the exercise of reasonable care and ordinary care, could not have seen or heard the engine approaching, and have stopped their horse and prevented the accident. Perhaps, this is not "confusion worse confused," but, at least, it has some of the elements of it. Perhaps, the trial court did, and possibly, the majority opinion may by reasoning similar to that applied to questions No. 10, 11, and 17, harmonize the apparent contributory negligence found in questions 19 and 20 and the absence of it in question 16. This court has repeatedly held that, pursuant to the statute, the special verdict must present conclusion of evidence as established by the evidence, and not the evidence to prove it; that the questions for a special verdict should be plain, single, and direct; that they should contain only the ultimate conclusions of facts in controversy. Nygaard v. Northern P. R. Co. 46 N. D. 1, 178 N. W. 961, and cases cited. Comp. Laws 1913, § 7632. As this court has heretofore held, questions should not be submitted that call for conclusions of law. Nygaard v. Northern P. R. Co. supra. It is apparent that the questions submitted do violence both to the statute and the repeated holdings of this court. They have served, as is apparent in this case, to mislead and confuse the jury; to submit to the jury an issue of law and plainly, as has been observed, to submit to the court an issue of fact. For it is evident that the trial court, particularly, this court in its majority opinion, determines the facts in this record, by interpretation, and after such interpretation, by answering the interrogatories submitted to the jury, and in direct opposition to the jury's direct findings upon questions of law submitted to it. The evident result is a mistrial. It may be that this is a close case, and that the right of plaintiff's recovery is a close question both of law and of fact. However that may be, close cases are those which give rise to acts of injustice, and close cases upon the law and the fact are particularly entitled to a fair and legal trial. It has not been accorded, in my opinion, in this case, and a new trial should be granted by reason thereof.

GRACE, J. (dissenting). I concur in the dissenting opinion of Mr. Justice Bronson, in this case. I concur in the greater part, but not in all, of the reasoning therein contained.

On Petition for Rehearing filed January 18, 1921.

PER CURIAM. Plaintiff has filed a petition for rehearing. The petition is largely a reargument of the cause. It is asserted that the ninth interrogatory was double and misleading. In the former opinion we considered this question, and arrived at the conclusion that, in view of the evidence in this case, the jury could not have been misled by the form of the question. As we stated in that opinion: "In this case there was absolutely no evidence and no contention that the whistle was blown as the locomotive approached the crossing." It is not contended that this statement is incorrect, but it is asserted that there was evidence to the effect that the locomotive blew the whistle when the train came into the village (some twenty minutes before the accident occurred), and that the jury might have had this in mind. We do not believe that this contention is at all tenable. The two preceding interrogatories clearly indicated both the time and the place to which the inquiry was restricted. The three interrogatories were as follows:

"7. At the time of such accident, if any occurred, was the railway company's engine and train, approaching Fourth avenue at the crossing of the railroad on the house track?

"8. At what rate of speed was said engine and train approaching and coming upon said crossing?

"9. Was the bell being rung or the whistle blown?"

These three interrogatories follow each other in logical order. The first two fix the time and place to which the inquiry is directed. The time is specifically stated to be, "at the time of such accident." The seventh and eighth interrogatory together inquire as to the rate of speed of the train, as it approached the Fourth avenue crossing at the time the accident occurred. The ninth interrogatory asks if the whistle was blown or the bell rung. Manifestly it referred to the same time and incident referred to in the previous questions. It is inconceivable that intelligent men could have understood it otherwise. Nor is there, under the evidence, any reason to doubt that the jury so understood the interrogatory; and that they must have found that the bell was rung for the requisite distance from the crossing. The evidence relating to the ringing of the bell was as follows:

Hannah Bartkowski, the driver, testified that she did not hear the bell. One Nowatzck, a witness for the plaintiff, testified also that he did not hear the bell. Opposed to this negative testimony the defendant introduced the testimony of the engineer and fireman, three brakemen, a farmer, two laborers, and the manager of a local lumberyard.

According to the testimony of the engineer and the fireman the locomotive was equipped with a device whereby, by turning a little valve, the bell was put in action, and would continue to ring until the valve was turned off. They further testified that the bell was rung continuously during the entire time they were engaged in switching. The testimony to the effect that the bell was rung during all the time they were engaged in switching was corroborated by the three brakemen. One Mohler, local manager of the Rogers Lumber Company, testified that at and immediately prior to the accident he was in a place where he could observe the crossing and the approach to it on the north side of the railway tracks; that he observed the brakeman warning the women by holding up his hand when they were more than 60 feet away from the crossing; that the brakeman made two attempts to stop them; that when the rig was more than 60 feet away from the track, Mohler observed that the bell was ringing. One Mansfield, a farmer living southwest of Courtenay, testified that at the time the accident occurred he was standing on Foshold's corner, about 100 feet south of the main track; that he observed the rig containing the two women approaching from the north; that he saw the brakeman warn them; that for sometime before he could see the locomotive he heard the bell ringing. One Ryan, a resident of Courtenay, who said he was a common laborer, testified that he was on his way to work; that he was coming down on the west side of main street going north (on the south side of the track); that as he was going down the street and opposite the Fire-hall (situated some 50 feet south of the main track); he heard the bell ringing, although he could not see the locomotive. He further testified: "When I got right about down to here, just between the passing track and the main line, I looked over here then, and the engine was just a little to the west of the coal shed, west of the east end, I should say. I had time to cross, and went across, and just as I got across the track out of the way, I heard somebody holler off to one side, and I turned and I seen a man raise his hand, doing that way [indicating];

it was one of the trainmen, but I don't know which." He further testified that during all of this time he heard the bell ringing. Somewhat similar testimony was given by one Wright, who also stated that his occupation was that of a common laborer.

It will be noted that, so far as there was any controversy relating to the ringing of the bell, it was whether the bell was being rung at all. As already stated two witnesses for the plaintiff testified that they did not hear the bell, and several witnesses testified for the defendant that the bell rang not only at the time of the accident, but for a considerable length of time prior thereto. If the witnesses for the defendant told the truth the bell was unquestionably rung as prescribed by the statute. If the facts were as the negative testimony adduced by the plaintiff tended to prove, then the bell did not ring at all. In answering, as they did, the jury must have believed the testimony of defendant's witnesses.

The other propositions advanced in the petition for rehearing were all considered at the time the former decision was promulgated. A majority of the court were of the opinion that, under the facts found by the jury, there was no actionable negligence on the part of the defendant; hence, the errors predicated upon requested instructions and proposed interrogatories bearing on the question of contributory negligence were deemed immaterial. A careful reconsideration of the case has not altered the views of the majority. And not a single authority has been found which we deem inconsistent with these views. Most of the cases which have been called to our attention are cases like Coulter v. Great Northern R. Co. 5 N. D. 568, 67 N. W. 1046, and Rober v. Northern P. R. Co. 25 N. D. 394, 142 N. W. 22, wherein some party was actually run over by train at a crossing. That, of course, is not the condition here. Here there is no contention that there was any collision.

We adhere to the former opinion. Rehearing denied.

BIRDZELL and ROBINSON, JJ., concur.